TOMÁS MONTES, Plaintiff and Appellant, *v.* STATE INSURANCE FUND OF PUERTO RICO ET AL., Respondents and Appellees.

No. 381.   Decided January 31, 1963.

*Angel Manuel Ciordia* for appellant. *J. B. Fernández Badillo, Solicitor General of Puerto Rico,* and *Juan A. Faría, Assistant Solicitor General,* for appellees.

Division composed of Mr. Justice Pérez Pimentel, as Chief Judge of Division, Mr. Justice Rigau, and Mr. Justice Dávila.

MR. JUSTICE DÁVILA delivered the opinion of the Court.

While working for his employer, a laborer, 57 years of age, married, and in good health, felt a strong pain in his waist, hips and thighs, fainted and fell to the floor. Taken to the State Insurance Fund he was submitted to physiotherapy and was discharged on August 11, 1953. The Fund believed that he needed no more treatment and that he could work again. He appealed to the Industrial Commission. After clinical examinations and other proper procedures, the Commission ordered by decision of November 30, 1954 that the case be referred again to the Fund "... in order to submit him to new X-ray and mielographic studies to eliminate the possibility of an intervertebral disk hernia ..." The Fund ordered the confinement of plaintiff in its Medico-Surgical Center with the following instruction:

"The above-mentioned laborer is referred for admission and neurological, X-ray, and mielographic studies by Dr. N. Rifkinson, pursuant to the order of the Industrial Commission. Diagnosis: Contusion in the right thigh. The X-ray showed no osseous pathology."

Hospitalized on December 28, 1954, he was submitted to examination between that date and February 17, 1955. On February 19, 1955, Dr. Rifkinson submitted a report to the State Insurance Fund recommending that the patient be operated of a multiple herniation of the pulpous nucleus. The laborer returned to his home while the Fund decided about his operation.

On February 24 the Fund decided in favor of the operation and the patient's hospitalization was ordered for the following March 7.

He was operated on March 15, 1955. Three vertebral disks in the lumbar region were removed. After the operation and apparently as a result thereof, paraplegy set on. He lacks the power of locomotion and must move on a wheelchair. He lost his sexual potency and has difficulty in evacuating and urinating, suffering from intense physical pain when doing so. He needs his wife's help for all his necessities and it is impossible for him to engage in useful tasks.

The Fund so acknowledged it in deciding that plaintiff has permanently suffered the "loss of one hundred per cent (100%) of his general physiological functions." The Fund granted $3,000, the permissible maximum.

He filed an action against the Fund and the Commonwealth claiming damages. He alleged that the operation to which he was submitted was practiced without his consent or his knowledge; that it was practiced in a negligent manner and that the surgeon who practiced it was acting as an employee of the Fund.

The trial court determined that the evidence did not show any negligence on the part of the doctor who practiced the

operation on plaintiff. "As a matter of fact," the court states, "plaintiff did not introduce any kind of evidence which directly or by reasonable inference establishes any fact or negligent act on the surgeon." But it determined that since the Fund ordered the operation without previously obtaining his consent, it had committed an illegal intervention on plaintiff. By said action plaintiff had the right to claim pursuant to the provisions of § § 1802 and 1803 of the Civil Code. The court granted $15,000 as compensation, plus costs, but without attorney's fees, pursuant to the provisions of § 2 of Act No. 104 of June 29, 1955—32 L.P.R.A. § 3077(a), Supp. 1961.

Reconsideration having been requested, the trial court rendered an order and judgment dismissing the complaint. Its judgment is grounded on the provisions of § 6(d) of the aforesaid Act No. 104. This section excludes from the Act which authorizes claims against the Commonwealth, the "actions for damages against the Commonwealth by reason of an act or omission of an officer, agent or employee: ... (d) which constitutes assault, battery, or any other offense against the person."

The court considered that the doctrine and case law have established that a surgical intervention practiced without the consent of the person constitutes assault and battery and therefore, claim against the State does not lie. We agreed to review the judgment.

■ We must state at the outset of this appeal that appellant has not submitted the transcript of evidence, for which reason we are unable to determine whether or not there was negligence on the part of the physician who practiced the operation. The appeal is limited hence to determining whether with the facts that the case presents there is liability on the part of the State in the Fund ordering the surgical intervention without the previous consent of the laborer.

In *Rojas* v. *Maldonado*, 68 P.R.R. 757 (1948), we stated that "it has been held that the consent of the patient is necessary in order to authorize a surgeon to perform an operation on the body of said patient, and that an operation performed without such consent is a tortious and illegal act which renders the surgeon liable for any damages caused to the patient." We also stated that "in acting without the authorization . . . the defendant committed a tortious act or Aquilian fault, which rendered him responsible for the consequences of his conduct, and he was legally bound to repair the damage so done."

The rule requiring consent to practice an operation is generally accepted. *Dicenzo* v. *Berg*, 16 A.2d 15 (Pa. 1940); *Schmeztz* v. *Tracy*, 177 Atl. 520 (Conn. 1935); *McClees* v. *Cohen*, 148 Atl. 124 (Md. 1930); *Paulsen* v. *Gundersen*, 260 N.E. 448 (Wis. 1935); *Natanson* v. *Kline*, 350 P.2d 1093 (Kan. 1960); *Hundley* v. *St. Francis Hospital*, 327 P.2d 131 (Cal. 1958); *Physicians' & Dentists Business Bureau* v. *Dray*, 111 P.2d 568 (Wash. 1941); *Carroll* v. *Chapman*, 139 So.2d 61 (La. 1962); *Moore* v. *Webb*, 345 S.W.2d 239 (Mo. 1961); WASMUTH, C.E., *Consent to Surgical Procedures*, 6 Clev.-Mar. L. Rev. 235 (1957). In *Mohr* v. *Williams*, 104 N.W. 12 (Minn. 1905), the court based its decision favorable to plaintiff on "the right to the inviolability of his person [which] necessarily forbids a physician or surgeon, however skillful or eminent . . . to violate, without permission, the bodily integrity of his patient by a major or capital operation." See, also, *Rogers* v. *Lumbermens Mutual Casualty Company*, 119 So.2d 649 (La. 1960).

█ It has been recognized that on certain occasions the consent of the person is not necessary, as in emergency cases in which it is impractical or impossible to obtain the consent of the patient. In these cases it is held that there has been implied consent. *Pratt* v. *Davis*, 79 N.E. 562 (Ill. 1906); *Mohr* v. *Williams*, *supra; Baxter* v. *Snow*, 2 P.2d 257 (Utah

1931), and Annotations in 139 A.L.R. 1370, 1371 (1942) and 56 A.L.R. 2d 695 (1957). Perhaps the best exposition of the law respecting this matter appears in McCoid, *A Reappraisal of Liability for Unauthorized Medical Treatment,* 41 Minn. L. Rev. 381, 392 (1957). It is stated therein:

"Every individual has a right to the inviolability of his person which forbids a surgeon or physician to invade the bodily integrity of his person. Whenever a surgeon or physician, without the patient's permission, performs an operation or renders medical treatment, he prima facie commits a battery. Exceptions will be recognized in unusual circumstances where it is impracticable to obtain the consent of the patient and where there is a serious threat to the life or health of the patient which must be dealt with immediately, either by rendering wholly unauthorized medical treatment or by extending the scope of an authorized operation to remove or overcome an unforeseen condition. The fact that the medical treatment to which there is no consent is not seriously harmful, or is in fact beneficial to the patient, does not excuse the doctor. Further, the fact that the treatment is conducted in accordance with the dictates of good surgery or medicine and is done in a skillful and careful manner does not constitute an excuse."

■ The Workmen's Accident Compensation Act, No. 45 of April 18, 1935—11 L.P.R.A. § 1 *et seq.* (1962 ed.), establishes in its § 3 that:

"In any case entitled to compensation, in which a surgical operation is necessary, the Manager of the State Insurance Fund shall have the right to order a medical examination, and if it is shown by said examination that the workman or employee has any chronic disease or is otherwise in a physical condition that ordinarily determines that such operation would be unsafe, the workman or employee shall receive his compensation for disability under the general provisions of this Act, even when he does not submit to such operation. If the examination does not show the existence of any disease or physical condition showing any danger in this operation, and the workman or employee, knowing the result of said examination, still persists in refusing to submit to such operation, he shall be entitled to only one-

half of the compensation ordinarily belonging to him under this Act."

The provision copied above, as stated by the trial court, "contemplates that, even in the case of a worker submitted to the jurisdiction of the State Insurance Fund, the worker must be consulted and his consent must be obtained as to any surgical intervention which is necessary on his person. In the case of a dangerous operation such circumstance must be made known to the worker."

We had already set forth that the Fund did not comply in this case with said requirements. The trial court, after making this finding denied compensation on reconsideration, on the grounds that a surgical intervention without the consent of the patient constitutes assault and battery. It cited, among others, the case of *Moss* v. *United States*, 225 F.2d 705 (8th Cir. 1955), which so holds upon considering a complaint against the Government of the United States for an operation practiced on a veteran. Compensation was denied on the grounds that the law which authorizes complaints against the **United States, Federal Tort Claims Act, 28 U.S.C.A.** § 2680, exempts from liability for claims "arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights."

■■■ Now Act No. 104 of 1955 in establishing the equivalent exception, provided that no actions for damages by reason of an act or omission of an employee "which constitutes assault, battery, or any other offense against the person" was authorized, clearly establishing, as stated in *Báez* v. *Commonwealth*, *ante*, p. 62, that "in order that the Commonwealth's immunity may not subsist under the exception of subd. (d) of § 6 of Act No. 104 of 1955 *supra*, the damage must flow from negligent acts of an employee which do not constitute certain offenses in which intent is an essential element." In other words, the consent given by the State

to be sued for damages for the act or omission of any officer, agent or employee is subject to the fact that such act does not constitute an offense wherein the intention is an essential element. To the same effect: *Meléndez v. Commonwealth*, 81 P.R.R. 798 (1960), where we stated: "What it had in mind rather [it refers to the provisions which we considered] was to maintain the immunity of the Commonwealth against suits originated by those wrongful acts committed deliberately or intentionally by its officers, agents or employees." See, also, *Valentín v. Commonwealth*, 84 P.R.R. 108 (1961). And to practice a surgical intervention on a person without his consent, although it may be technically considered as assault and battery, does not constitute the offense of assault and battery punishable by our Penal Code because it lacks the essential element of the intention. Penal Code, 33 L.P.R.A. § 821; *Báez v. Commonwealth, supra; cf. Dobbins v. Hato Rey Psychiatric Hospital, ante,* p. 28.

▪ In considering the liability of the state in those cases in which a suit is filed pursuant to Act No. 104 of 1955, we should keep in mind the advice of Mr. Justice Harlan, when he was Circuit Judge of the Court of Appeals for the Second Circuit, in the case of *Panella v. United States*, 216 F.2d 622 (2d Cir. 1954). He stated the following:

"In construing the language of the Act, [it refers to the Federal Tort Claims Act] we should, on the one hand, give full scope to the Government's relinquishment of its historic immunity from suit, and on the other hand, avoid narrowing the provisions which set forth situations in which Congress has seen fit to retain that immunity... we should be untrammeled by any rule of 'strict' or 'liberal' construction."

It is interesting to point out that it has been held that even under the provisions of the Federal Tort Claims Act, what was actually intended to be exempted from the waiver of immunity on the part of the sovereign were those "malicious and willful torts," that is, "deliberate torts." GOTTLIEB,

*The Federal Tort Claims Act, A Statutory Interpretation,*
35 Geo. L. J. 1-49-50 (1946); Commentary, 38 Minn. L.
Rev. 890 (1954); Note, 41 Ore. L. Rev. 78 (1961), where
criticism is made of the case of Moss. *Cf. Tastor* v. *United
States,* 124 F. Supp. 548 (D.C. Cal. 1954); *Cerri* v. *United
States,* 80 F. Supp. 831 (D.C. Cal. 1948). In the case of
*Panella* v. *United States, supra,* it was stated:

"In the 77th Congress, the Justice Department spokesman
for the bill submitted a memorandum, containing the following:
'The other exceptions in section 402 relate to *certain Govern-
mental activities* which should be free from the restraint of dam-
age suits, or for which adequate remedies are already available.
The exemptions include claims arising out of the loss or mis-
carriage of postal matter, the assessment or collection of taxes
or duties, military or naval activity during wartime, the deten-
tion of goods by customs officers, *deliberate torts such as assault
and battery,* and some others. The exempted claims for which
due provision has already been made by law are admiralty and
maritime torts, claims made under the Federal Employees' Com-
pensation Act, and the like.' (Italics supplied.)   See Hearings
on H.R. 5373 and H.R. 6463, 77th Cong., 2d Sess., p. 28.   And
during the course of the Hearing he was questioned as follows:
'Mr. Robsion: On that point of deliberate assault that is where
*some agent* of the Government gets in a fight with some fellow?
Mr. Shea: Yes.   Mr. Robsion: And socks him?   Mr. Shea:
That is right.' (Italics supplied.)   See Hearings on H.R. 5373
and H.R. 6463, 77th Cong., 2d Sess., p. 33.

"The 79th Congress, which finally passed the bill, held no
hearings on it.   But the committee reports recommending pas-
sage also carried over the language of the Department of Jus-
tice memorandum, just referred to.   See H.R. Rep. 1287, 79th
Cong., 1st Sess., p. 6; S. Rep. 1400, 79th Cong., 2d Sess., p. 33."

▮▮▮ The fact that the worker has been compensated by
the Fund in no way defeats his right to be compensated for
the surgical intervention which was practiced without his
consent.   The exclusiveness of the remedy provided by the
Workmens' Accident Compensation Act is for the injury suf-
fered in his work; and to that effect it provides that "the

right . . . established to obtain compensation shall be the only remedy against the employer"; § 20 —11 L.P.R.A. § 21 (1962 ed.)—*Onna* v. *The Texas Co.*, 64 P.R.R. 497 (1945), while the action filed in the present case is based on the action of the Fund in submitting appellant to an operation without his consent.

It having been established that the action filed should prosper, we have only to determine the amount of the damages. When the trial court rendered its first judgment it granted $15,000 as compensation, and it was later on reconsideration, in the belief that liability on the part of the state did not lie, that it dismissed the complaint. The judgment appealed from will be reversed, the complaint sustained, and $15,000 will be granted for compensation, plus costs.